```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
K&G ELECTRIC MOTOR & PUMP
CORPORATION d/b/a KG POWER SYSTEMS,           MEMORANDUM & ORDER

                    Plaintiff,                 18-CV-2308 (DRH)(SIL)

      -against-

INGERSOLL-RAND COMPANY,

                    Defendant.
----------------------------------------------------------X
```

**APPEARANCES:**

**For Plaintiff:**
Plummer & Plummer, LLP
77 Arkay Drive, Suite H
Hauppauge, NY 11788
By:    Hubert G. Plummer, Esq.

**For Defendant:**
Baker & Hostetler, LLP
45 Rockefeller Plaza
New York, NY 10111
By:    Matthew D. Feil

**HURLEY, Senior District Judge:**

Plaintiff K & G Electric Motor & Pump Corp. ("Plaintiff" or "KG")) commenced this action against Defendant Ingersoll-Rand Company ("Defendant" or "IR") asserting claims for breach of contract, promissory estoppel, tortious interference with prospective economic advantage and fraud. Presently before the Court is Defendant's motion to dismiss the second amended complaint ("SAC"). For the reasons set forth below, the motion is granted.

# BACKGROUND

The following allegations are taken from the SAC and assumed true for purposes of this motion. Preliminarily, the court notes that the SAC is not a model of clarity, that some of the dates set forth as taken from the SAC appear to be erroneous, and, as discussed, the allegations therein are contradicted by documents attached to it.

## A.    Background Allegations

Plaintiff is a family owned small business selling and servicing mechanical equipment since 1949 and Defendant is a diversified industrial manufacturer selling its products globally. (SAC ¶¶ 3, 4.) Plaintiff has been a distributor of Defendant's equipment since 1990 and expended substantial sums in developing close business relationships with many customers including the City of New York and its various departments.  In 2014, the parties entered into a Distribution Agreement (the "Agreement") whereby Defendant granted Plaintiff non-exclusive distribution rights of its products in the Long Island and New York City markets. Seventy percent of Plaintiff's revenue in 2014 came from its sales of Defendants products and services. The Agreement required Plaintiff to use Defendant's proprietary software which required a log-in ID for every user to order IR's products. (*Id*. ¶¶ 9-13.)

On September 23, 2015, Kirk Highfill ("Highfill"), Defendant's Director of Distribution for North America, arrived at Plaintiff's place of business and "seized Plaintiff's business records" for the alleged purposes of conducting an audit thereof. On December 19, 2015 IR issued a charge back for alleged fraudulent invoicing, as well as freight allowances and discount codes  to which KG was entitled. Intimidated by Highfill's threats and demands, KG paid

$282,391.00 to remain a distributor for IR. "Despite this payment, Highfill declared KG in breach of the

Agreement, in which he falsely alleged fraud and falsely tied to sales performance. Highfill demanded KG sign a mutual termination agreement;" KG did not sign any such agreement. (Comp. ¶¶ 14-22.)

### B. Additional Allegations in Support of Breach of Contract Claim

"IR breached the terms of the Agreement by falsely claiming KG to be in default under the terms of the agreement and demanding payment of $282,391.00 for that breach and then terminating the Agreement." On December 1, 2015, after Defendant's alleged audit of Plaintiff's business records, Highfill sent KG a letter claiming it had defrauded Defendant of $211,113.00 from the inception of the Agreement through August 2015; he further demanded the immediate return of those funds and that KG "prove itself over the following six months in order to remain a Distributor for IR", which proof "would require monthly reports and other burdensome demands." Highfill also stated he was willing to accept repayment of the funds and KG's immediate resignation as a dealer. (*Id.* ¶¶ 20, 26.) Highfill's demands did not comply with section 16 of the Agreement as it did not provide sixty days to cure or allege the elements for immediate termination. In another letter that followed on January 28, 2016, Defendant claimed Plaintiff owed it another $61,278.00 for fraudulent discounts taken between September and November of 2015 and demanded payment therefor "under the same terms as the December letter." (*Id.* ¶ 29.)

On April 25, 2016, Highfill sent KG a letter declaring KG "had failed to meet sales figures and demanded it signed an attached termination letter. As "April is less than six months

from December[, t]his decision had been made in advance and IR had no intention of continuing KG's distributorship." (*Id.* ¶¶ 31-32.)

Neither the December 1 nor the April 25 letter complied with section 16 of the Agreement. "IR's false declaration of fraud by KG is a breach and deprives KG of the right to receive its benefits under the Agreement and as such is a breach of the implied covenant of good faith and fair dealing." (*Id.* ¶¶ 28, 33-34.)

### C. Additional Allegations in Support of Claim for Promissory Estoppel

By reason of the letters sent by Highfill, IR promised that if KG paid it $282,391.00, KG would be allowed to remain as a distributor for IR "for six months and beyond depending on performance." In reliance on that promise KG paid the requested amount but "[i]n less than six months IR had already declared KG to be below performance standards and terminated the distributorship." (SAC ¶¶ 37-39.)

### D. Additional Allegations in Support of Claim for Intentional Interference with Prospective Economic Advantage

KG has sold and provided service, including IR equipment, to the City of New York and its various agencies and departments for many years; IG was aware of this long-standing relationship. IR declared KG to be in default of the Agreement "with the intention of disrupting the existing relationship between KG and the City of New York so that IR could gain that business for itself." As a result of IR's interference KG has lost a significant portion of its business and been forced to pay more for parts to service the City of New York customers that remain. (SAC ¶¶ 42-45.)

### E. Additional Allegations in Support of Fraud Claim

IR, through Highfill, "falsely claimed KG to be in default under the Agreement and threatened termination if KG did not repay the value of certain discounts it was entitled to." "IR

demanded these repayments with the promise of allowing KG to remain a distributor," but had no intention of doing so. "Frightened by these threats and anxious to keep the business relationship with IR", KG paid $282,391 to IR. Once IR received the payment, it declared KG in default and demanded KG sign a mutual termination agreement. (SAC 48-53.)

  F.  **Documents Attached to the Complaint**

There are four exhibits attached to the SAC.

  1.  <u>The Agreement</u>

The first exhibit is the Agreement whereby KG was appointed a "non-exclusive authorized distributor for stocking, selling and servicing" equipment marketed and manufactured by IR. (Ex. A to SAC, at ¶ 1(a).) KG's sales obligations as a distributor included "us[ing] its continuing best efforts to develop the sale of equipment within the Territory" and "submit[ting] a business and three year forecast based upon specific goals and objectives that have been mutually agreed to by both parties . . . ." (*Id*. at ¶2(a).) The Agreement provided that "[i]n determining whether [KG's] level of sales and other aspects of performance constitute its best efforts in any period, [IR] could consider [KG's] performance in meeting the sales, market penetration and other goals set forth in the business and the forecast module for the Territory." (*Id*.) KG was also required to "use the business system software programs provided by [IR] for the quote process, order management, customer site and contact management, sales data and other activities . . ." and to maintain records relating to Equipment sold, "which [IR] may examine at any time." (*Id. at* ¶¶ 2(b), (c), (e).

Paragraph 16 sets forth the circumstance under which Defendant may terminate the Agreement prior to its expiration date of July 31, 2017. It provides in relevant part as follows:

> [IR] may terminate this Agreement by giving [KG] at least sixty (60) days prior written notice in the event (i) [KG] fails to satisfy or perform any of its material obligations set forth in this Agreement, (ii) after notice to [KG] of a sales deficiency and the expiration of a reasonable period of time within which to cure such deficiency, [KG] failed to maintain a level of sales of Equipment to perform in accordance with the DISTRIBUTOR Sales and Marketing Action Plan as provided in section 2(a), (iii) there is any material dispute . . . among the principals . . . of [KG] or any loss of . . . key employees . . . which in the reasonable judgment of [IR] may adversely affect the business of [KG] or [IR]; (iv) the failure by [KG] to pay any amount owed to [IR] when due or the failure of [KG] to account to [IR] for the proceeds from the sale of Equipment for which [KG] is indebted to [IR]; (v) the breach by [KG] of any collateral agreements entered into in connection with this Agreement; (vi) the financial condition of [KG] becoming so impaired . . . as to endanger [its] ability to perform its obligation in accordance with this agreement; provided, however, that if the foregoing failure or condition is something that may be cured then [KG] shall have sixty (60) days to effect such cure.

(*Id*. at ¶ 16(c).) It also provides for immediate termination by notice if (1) there is an assignment by KG for the benefit of creditors; (2) a receiver is appointed for KG; (3) KG becomes insolvent or a petition of bankruptcy is filed by or against it; (4) KG assigns the Agreement without IR's consent; or (5) KG abandons or suspends its operations. (*Id*. at ¶ 16(d).)

    2.    <u>The December 1, 2015 Letter</u>

The December 1, 2015 letter from Highfill to KG states:

> As you are aware, [IR] conducted an audit into the discount practices of [KG]. The results of this audit show that KG is falsely applying discount codes to orders from IR that do not qualify for said discounts. The audit through August 2015 showed a total amount KG profited from IR due to these false claims is $221,113.00. After the audit of September, October, and November 2015 will [sic] produce the remaining profits from IR.
> While this fraudulent action is grounds for termination of KG's status as an authorized distributor of IR, after much internal discussion we would propose the following alternative actions.
> First, KG repay in full all amounts obtained through these fraudulent discount claims. Second, KG will show, over the next six months, that the past and future success of KG's business is not reliant on receiving these fraudulent discounts. To this end, KG will submit monthly sales updates regarding sales made within KG's territory and participate in monthly sales calls with IR team members to determine whether KG is meeting the sales targets we will mutually set forth. If after six months have elapsed, KG is unable to meet its performance goals, both sides will

sign a mutual termination agreement. In order to monitor the use of special pricing, the blanket special pricing structures will be suspended immediately, and discounts may be approved on an individual basis. Similarly, dealer accounts will be suspended, and, in the event there is a sale to a dealer, that will need to be approved by IR for that specific transaction to be discounted.

Alternatively, IR is willing to accept repayment of the fraudulent discounts and accept KG's resignation as a distributor effective immediately.

Please contact me at your earliest convenience to discuss which of these options KG believes provides both of us with the most potential future success.

(Ex. B to SAC.)

### 3. The January 28, 2016

By letter dated January 28, 2016, Highfill advised KG that the audit for September to November 2015, showed KG owed IR $61,278.00 and that IR would be invoicing KG on "I4 terms (4 equal payments net 30 each no cash discount)" for that amount and that "the same rules of engagement apply from [the] letter to KG on December 1, 2015." It then repeated those terms, word for word. (Ex. C to SAC.)

### 4. Exhibit D

Although the SAC identifies exhibit D as an April 25, 2016 letter (*see* SAC ¶31), it consists of two documents.

The first document is a April 25, 2016 letter from Highfill to KG. It states:

As you are aware, from the notification letter dated December 1, 2015 conditions of the audit findings conducted by [IR] stated, KG will show, over a six month period that the past and future success of KG's business was and is not reliant on the illicit discounts discovered during the audit, To this end KG is submitting monthly updates regarding sales . . . and participating in monthly calls with IR team members to determine whether KG is meeting the sales targets we mutually set forth.
During the recent monthly call with IR which covered the results for Q1 2016 it was determined that [KG] was only at 62% of the mutually agreed goal for Completes booking. Although the Q1 numbers were acceptable for parts & service, the gap of $219k in completes booking is a concern. As a reminder, the completes booking goal for Q2 is 572K plus the shortfall from Q1.

> As stated in the notification letter, if after six months have elapsed, KG is unable to meet its performance goals, KG will sign a termination agreement evidencing its resignation as a distributor.

(Ex. D to SAC at p.1).

The second document is an email, dated June 14, 2016, with an attachment, from Highfill to KG regarding the subject "Mutual Separation Letter" stating that "as we discussed please sign the attached letter & return to myself. After I sign & return to you I will call you and have dialogue with you on PackageCARE & Parts sales. Call me with any questions." (Ex. D to SAC, at p. 2.) The attachment is entitled "Mutual Separation Agreement." It states that it is being entered into on June 15, 2016 "('the Effective Date')" and that IR and KG "mutually agree to terminate the Agreement as of the Effective Date." It is unsigned. (*Id*. at p. 3.)

## DISCUSSION

### I. Standard of Review: Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co*., 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The plausibility standard is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679.

A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.' " *Id*. at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig*., 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

"In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint–Pepperell, Inc*., 945 F.2d 40, 44 (2d Cir. 1991)); *see Weiss v. Village of Sag Harbor*, 762 F. Supp. 560, 567 (E.D.N.Y. 2011) (in deciding a motion to dismiss a court is entitled to consider, inter alia, "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference" and "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the

complaint"). A document may be considered on a motion to dismiss where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted). Where an allegation in a complaint is contradicted by a document or exhibit attached to the complaint, the document controls and the allegation is not afforded the presumption of truth for purposes of a motion to dismiss. *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (citing *L-7 Designs Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)); *Matusovsky v. Merrill Lynch*, 186 F. Supp.2d 397, 400 (S.D.N.Y. 2002).

## II. The Parties' Contentions

Defendant contends that Plaintiff's breach of contract claim cannot survive a motion to dismiss because it does not plausibly allege that IR breached the Agreement, it does not allege that KG met its own obligations under the Agreement, and it does not to allege any damages proximately caused by the alleged breach. (Def.'s Mem. at 3-12.) It further argues that Plaintiff's claims for promissory estoppel and fraud are impermissibly duplicative, rather than alternative theories of liability, that the fraud claim is insufficiently plead, and that the tortious interference claim is deficient as it does not specify an actual contract or existing business relationship Plaintiff had with the City of New York. (*Id.* at 12-19.)

Plaintiff's opposition papers merely repeat its claims and state the pleadings are sufficient to move forward.

## II. The Breach of Contract Claim

The elements of a breach of contract claim in New York are "(1) the existence of agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

According to the Second Amended Complaint, Defendant breached the contract in two ways. First, Defendant terminated the Agreement prior to the close of an agreed upon "probationary period" in violation of §16 of the Agreement. (SAC ¶ 30.) Second, by falsely accusing the Plaintiff of fraud and issuing an improper back charge, Defendant thereby breached the implied covenant of good faith and fair dealing. (SAC ¶¶ 24, 34.) This Court will examine each alleged breach in turn.

### A. Alleged Breach of §16 of the Agreement

Section16 of the Agreement describes the chronological term of the Agreement and outlines the procedures of its termination in the case of breach. Specifically, Plaintiff alleges Defendant violated of §16(c) by demanding in the December 1, 2015 and January 28, 2016 that Plaintiff resign its position as a distributor for Defendant and pay the owed back charges "immediately" because that section gives Plaintiff 60 days to cure any breach or shortfall wherever possible. This theory is contradicted by the very exhibits relied upon. Neither the December 1, 2015 and January 28, 2016 letters demand immediate repayment of the owed back charges, nor do they demand an immediate resignation. Both letters present immediate resignation as an option for the Plaintiff, but also contain the alternative option, which the Plaintiff apparently took, to repay the back charges and retain its status as Defendant's distributor through the ensuing six-month "probationary period." (SAC, Exhs. B, C.) Neither letter demands the monetary repayment be made immediately. *Id.* In fact, the latter letter specifically references invoicing Plaintiff for the claimed amount in four installments. Also, Plaintiff's agreement to the alternative option is the basis for the remainder of its §16 breach

claim; it is alleged that Defendant's conduct *during* that probationary period violated §16 of the Agreement.

According to Plaintiff, that Defendant violated §16 of the agreement by terminating Plaintiff's distributorship before the end of the six-month probationary period it proposed in the December 1, 2015 and January 28, 2016 letters with a third letter, dated April 25, 2016. (SAC ¶ 31-32.) This claim is not plausible for two reasons. First, the six-month probationary period is significantly *longer* than the 60-day notice of termination period required by the Agreement. Second, the Plaintiff's own exhibits contradict this allegation. Defendant's April 25, 2016 letter mentions no termination agreement, but rather includes an update of sorts as to the gap between Plaintiff's sales performance and the sales requirements thus far in the probationary period. (SAC, Exh. D.) It also includes a reminder that the Plaintiff's distributorship would be terminated by mutual agreement at the end of the probationary period if KG failed to meet its requirements for the remainder of the period and make up for its shortfall it had accrued to that point. *Id.* Thus, according to that exhibit, Plaintiff was still a distributor as of that date. It is the Defendant's e-mail to the Plaintiff on June 14, 2016 that included the termination agreement for the Plaintiff to sign. (SAC, Exh. E.) June 14, 2016 is, of course, more than six months after December 1, 2015, and thus past the conclusion of the probationary period. Additionally, the request in the June 14, 2016 email that Plaintiff sign a mutual termination agreement effective June 15, 2016 is an unnecessary request if Defendant had already terminated the Agreement.[1] As noted earlier, where an allegation in a complaint is contradicted by a document or exhibit attached to the complaint, the document controls and the allegation is not afforded the

---

[1] It is also noteworthy that Plaintiff asserts it did not sign the mutual termination agreement, but there is no allegation that Plaintiff having failed to sign the mutual termination agreement Defendant went ahead and unilaterally terminated the Agreement.

presumption of truth for the purposes of a motion to dismiss. *See, e.g., Amidax Trading Grp. v. S.W.I.F.T. Scrl, et al.*, 671 F. 3d 140, 146-147 (2d Cir. 2011); *see Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

In sum, Plaintiff has failed to plead a plausible claim that Defendant breached section 16 of the Agreement.

### B.  Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing

Beyond the violation of any specific provision of the Agreement, Plaintiff also alleges the Defendant's violation of the implied covenant of good faith and fair dealing. Under New York law, a covenant of good faith and fair dealing in the course of contract performance is implicit in all contracts. *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 696 (S.D.N.Y. 2018). A breach of the implied covenant of good faith and fair dealing is sufficient to constitute a breach of the underlying contract. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). To successfully plead a breach of contract under a theory of breach of the implied covenant, a plaintiff must allege that defendant, in bad faith, engaged in behavior that effectually destroyed or injured the plaintiff's right to receive 'the fruits of the contract.' *Burton*, 344 F. Supp. 3d at 696. Further, plaintiffs are required to plead "specific factual allegations of a party's bad faith," as "conclusory allegations of a party's failure to act in good faith are insufficient." *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007).

Plaintiff claims that Defendant breached the implied covenant of good faith and fair dealing by falsely representing that Plaintiff owed it $282,391.00 for taking fraudulent discounts on its products, and then using the incident to justify its decision to terminate Plaintiff's distributorship. Plaintiff asserts that it took only discounts to which it was entitled but paid the

amount anyway for fear of the Defendant taking away its business. No specific facts as to how the software worked or what discounts KG took that were challenged.

The Second Amended Complaint is unclear as to exactly which benefits of the Agreement the Plaintiff was denied as a result of Defendant's alleged misrepresentation. Plaintiff's Affirmation in Opposition suggests that Defendant denied Plaintiff's right, under the Agreement, to continue its distributorship through to the end of the contract's term because it paid the demanded back charge. (*See* Plaintiff's Opposition, p. 6.) This contention, while correctly identifying continued distributorship as a benefit of contract, does not fit with Plaintiff's theory it should have never been charged for improper discounts in the first place. Moreover, it supports nothing more than a breach of §16 of the Agreement and thus fails for the same reasons Plaintiff's breach of §16 claim fails.

Plaintiff attempts to combine several theories of breach into one, without supportive factual allegations. It argues that it cured its own discount-taking breach sufficiently with its payment of the back charge, but also that it never breached by taking fraudulent discounts in the first place. It argues that it was not given enough time to cure its failure to meet contractual sales obligations because the Defendant terminated the Agreement too early, while arguing that it did not fail to meet its sales obligations at all, or that it did but those obligation numbers were set unilaterally by the Defendant. *Id.* Plaintiff does not plead any facts to support these various and contradictory theories. For example, when payment of the charge was made is not specified and no figures regarding its sales quota before and after the December 1 letter are provided. Having failed to plead such facts, Plaintiff fails to plausibly plead a breach of the implied covenant of good faith and fair dealing. Defendant's motion to dismiss Plaintiff's breach of contract claim is granted.

### III. Promissory Estoppel

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 612, 615 (2d Cir. 2000). A promissory estoppel claim may proceed jointly with a breach of contract claim only where it is unclear whether a valid contract exists. *BLD Prods., LLC v. Viacom, Inc.*, 2011 WL 1327340, at * 15 (S.D.N.Y. Mar. 31, 2011). It is duplicative of a breach of contract claim, however, where the plaintiff fails to allege that the defendant had a duty independent from any arising out of the contract. *Benefitvision, Inc. v. Gentiva Health Services, Inc.*, 2014 WL 298406, at *9 (E.D.N.Y. Jan. 28, 2014).

Here, Plaintiff contends that the Defendant's extra-contractual promise that if Plaintiff paid it $282,391.00 it "would be allowed to remain as a distributor for IR for six months and beyond depending on future performance." But "[i]n less than six months IR had already declared KG to be below performance standards and terminated the distributorship."

Plaintiff's promissory estoppel claim is impermissibly duplicative of its breach of contract claim, as it is based on the same alleged conduct as the breach of contract claim and seeks the same amount in damages. There are no allegations that IR owed any duties independent of those alleged under the Agreement. *See* Benefitvision, 2014 WL 298406, at *9. Moreover, as discussed earlier, the exhibits attached to the SAC demonstrate that the Defendant indeed proposed final termination *after* the promised six-month probationary period closed.

Defendant's motion to dismiss Plaintiff's claim for promissory estoppel is granted.

### IV. Tortious Interference Claim

To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (internal quotation marks and citation omitted). In general, a defendant's conduct must amount to a crime or an independent tort to qualify as tortious interference with prospective economic advantage. *Friedman v. Coldwater Creek, Inc.*, 321 Fed. Appx. 58, 60 (2d Cir. 2009). "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed 'wrongful means,'" which include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions," and "extreme and unfair economic pressure." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). If the defendant's motive in interfering was normal economic self-interest, however, the defendant did not use wrongful means. *Id.* Additionally, a claim for tortious interference with prospective economic advantage requires a plaintiff to allege some conduct on the part of the defendant directed toward a third party. *Ortiz v. Todres & Co., LLP*, 2019 WL 120785, at *6 (S.D.N.Y. Mar. 14, 2019); *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 239 (S.D.N.Y. 2018); *Commercial Lubricants, LLC v. Safety-Kleen Systems, Inc.*, 2017 WL 3432073, at *16 (E.D.N.Y. Aug. 8, 2017).

Plaintiff's claim for tortious interference with prospective economic advantage fails because it neglects to allege that Defendant directed any tortious, criminal, wrongful, or otherwise improper conduct toward a third party with which the Plaintiff had an existing business relationship. The only conduct the Plaintiff specifically alleges on the part of the Defendant is the termination of the Agreement between the two parties, potential grounds for a breach of contract claim but no criminal or tort claim. "Wrongful" or improper conduct, outside of tortious or criminal conduct, exists only where a defendant engages in conduct for the sole purpose of inflicting intentional harm on the plaintiff. *Carvel*, 3 N.Y.3d at 190. Even if the Defendant did create a direct business relationship with the City of New York in Plaintiff's stead, Plaintiff fails to allege that the Defendant contacted the City of New York at all prior to its termination of the Agreement, or that the Defendant acted outside of its own economic self-interest for the sole purpose of harming the Plaintiff.[2]

In opposing Defendant's motion, Plaintiff cites case law enumerating the elements of a claim for tortious interference with contract, a separate and distinct cause of action from the tortious interference with prospective economic advantage claim in made in the SAC. But the allegations in the SAC do not support such a claim.

Under New York law, the elements of tortious interference with contract are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) the actual breach of the contract; and (5) damages resulting therefrom." *S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery Inc.*, 751 Fed. Appx. 39, 40 (2d Cir. 2018) (quoting *Kirch*, 449 F.3d at 401-02). As Defendant correctly notes,

---

[2] The court notes, parenthetically, that under the Agreement KG was appointed a "non-exclusive authorized distributor."

Plaintiff is obligated to allege the existence of a valid contract between it and a third party. *See Amto, LLC v. Bedford Asset Mgmt., LLC*, 168 F. Supp. 3d 556, 567-68 (S.D.N.Y. 2016) (dismissing a claim for tortious interference with a contract where plaintiff failed to show the existence of a valid contract with a third party); *Plasticware, LLC v. Flint Hill Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) (holding that plaintiff merely alleging it had "agreements" with its customers is insufficient to plead the existence of a valid contract for a tortious interference with contract claim).

Here, Plaintiff's allegations that it enjoyed a "long standing relationship" with the City of New York is not sufficient to plead the existence of a valid contract as necessary to prevail on a tortious interference with contract claim. *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt. LLC*, 455 Fed. Appx. 102, 104 (2d Cir. 2012) (dismissing a tortious interference with contract claim because plaintiff's allegation of a "long-standing agreement" with a third party failed to "plausibly plead the existence of a contractual relationship"). Plaintiff further fails to plausibly allege Defendant's intentional procurement of the City's breach of any contract. Finally, Plaintiff fails to adequately allege its damages, and makes no effort to explain why the $282,391.00 it paid in back charges to the Defendant is also the amount of damages resulting from the Defendant's tortious interference with its relationship with the City of New York. Plaintiff does not allege any amount of damages representing the lost value of the breached contract with the City of New York, as it would need to survive the instant motion to dismiss.

Defendant's motion to dismiss Plaintiff's claim of tortious interference with prospective economic advantage is granted.

V.  Fraud

Under New York law, fraud requires proof of "(1) a material misrepresentation or omission of fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the Plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 170 (2d Cir. 2015). Federal Rule of Civil Procedure 9(b) requires a plaintiff making a fraud claim to state the circumstances constituting the fraud with particularity. *Eternity Glob. Master Fund Ltd. v. Morgan Guaranty Tr. Co. of New York,* 375 F.3d 168, 187 (2d Cir. 2004). To plead fraud with sufficient particularity, a plaintiff must "detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.*

Plaintiff argues that Defendant committed fraud when Mr. Highfill knowingly and falsely accused Plaintiff of taking discounts to which it was not entitled, and then threatening to terminate the Agreement if the Plaintiff did not repay the value of those discounts. (SAC ¶ 48.) It also contends that Defendant's promise to allow Plaintiff to remain a distributor if it paid was fraudulent, for the Defendant truly intended to terminate the Agreement after repayment. (*Id.* ¶ 49-50, 52-53.)

Plaintiff's fraud claims fail on a number of fronts.

First, with regards the fraudulent nature of Mr. Highfill's representation that Plaintiff took improper discounts no facts are alleged to support that that the discounts were properly taken; the SAC contains only a conclusory allegation.

Second, the claim that Defendant intended to terminate the Agreement despite its promise is duplicative of the breach of contract claim. To bring parallel fraud and breach of contract

claims, a plaintiff must (1) demonstrate a legal duty separate from the duty under the contract; (2) identify a fraudulent misrepresentation that is collateral or extraneous to the contract or seek special damages that are not recoverable as contract damages. *See Merrill Lynch & Co. v. Allegheny Energy, Inc.,* 500 F.3d 171, 183 (2d Cir. 2007). The SAC contains no allegations regarding these exceptions. In fact, its fraud claim is based on the same allegation as its breach of contract claim, i.e. that IR promised not to terminate the agreement for at least six months to provide Plaintiff an opportunity to meet its sales obligations. Further, no special damages are claimed as Plaintiff seeks as damages on its fraud claim the same amount $282,391.00 that it paid back and seeks for its breach of contract claim.

The motion to dismiss the fraud claim is granted.

## CONCLUSION

Defendant's motion to dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) is granted. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York  　　　　　　　　　　　s/ Denis R. Hurley
　　　　August 27, 2019  　　　　　　　　　　　　　　Denis R. Hurley
　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge